**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

| | | |
|---|---|---|
| ALAN BRAID, | ) | Appeal from the United States |
| | ) | District Court for the Northern |
| *Plaintiff-Appellant,* | ) | District of Illinois, Eastern |
| | ) | Division |
| v. | ) | |
| | ) | No. 1:21-cv-05283 |
| OSCAR A. STILLEY, et al., | ) | |
| | ) | Honorable Jorge L. Alonso, |
| *Defendants-Appellees.* | ) | District Court Judge |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**BRIEF OF *AMICI CURIAE* CIVIL PROCEDURE PROFESSORS
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

Lindsay C. Harrison
 *Counsel of Record*
Leslie K. Bruce
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6865
lharrison@jenner.com

*Counsel for Amici Curiae*

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>22-2815</u>

Short Caption: <u>Alan Braid v. Oscar Stilley et al.</u>

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]  PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  <u>Professors Andrew D. Bradt, Zachary D. Clopton, and D. Theodore Rave as *Amici Curiae*</u>

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

  <u>Jenner & Block LLP for *Amici Curiae*</u>

(3)  If the party or amicus is a corporation:

  i)  Identify all of its parent corporations, if any; and
    <u>None</u>

  ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:
    <u>None</u>

4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  <u>N/A</u>

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  <u>N/A</u>

Attorney's Signature <u>/s/ Lindsay C. Harrison</u>  Date: <u>February 16, 2023</u>

Attorney's Printed Name: <u>Lindsay C. Harrison</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** <u>X</u>
                         **No** <u>  </u>

Address:  <u>1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412</u>

Phone Number: <u>(202) 639-6865</u>    Fax Number: <u>(202) 639-6066</u>

E-Mail Address: <u>lharrison@jenner.com</u>

Appellate Court No. 22-2815

Short Caption: Alan Braid v. Oscar Stilley et al.

     To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

     The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Professors Andrew D. Bradt, Zachary D. Clopton, and D. Theodore Rave as *Amici Curiae*

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for *Amici Curiae*

(3)     If the party or amicus is a corporation:

     i)     Identify all of its parent corporations, if any; and
     None

     ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:
     None

4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature /s/ Leslie K. Bruce     Date: February 16, 2023

Attorney's Printed Name: Leslie K. Bruce

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      **Yes**
     **No**     X

Address:     1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412

Phone Number: (202) 639-6891     Fax Number: (202) 639-6066

E-Mail Address: lbruce@jenner.com

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS............................................. i

TABLE OF AUTHORITIES.................................................................................iv

IDENTITY AND INTEREST OF *AMICI CURIAE* .................................................. 1

SUMMARY OF ARGUMENT ............................................................................ 2

ARGUMENT ................................................................................................... 4

I. Congress Established Federal Interpleader to Resolve Disputes Among Diverse Claimants and Reduce Duplicative Litigation ................. 4

    A. Interpleader is a flexible, long-standing aggregation device in American law ........................................................................... 4

    B. Congress specifically granted jurisdiction over interpleader actions to the federal courts and has consistently expanded the scope of their authority............................................................ 6

        i. Congress enacted the federal interpleader statute to settle disputes among claimants from different states and protect stakeholders from the vexation of multiple lawsuits ..................................................................... 6

        ii. Congress has repeatedly liberalized federal interpleader and expanded federal jurisdiction over such actions ...................................................................... 8

        iii. Interpleader is one of many procedural devices designed to empower federal courts to resolve multiparty litigation .......................................................... 12

II. Federal Interpleader Is Appropriate for Resolving Conflicting Claims and Duplicative Proceedings That Result From S.B. 8-Type Enforcement Regimes ........................................................................ 15

    A. S.B. 8 creates conflicting claims among adverse parties............... 16

    B. S.B. 8 is designed to encourage burdensome duplicative litigation....................................................................................... 17

CONCLUSION ............................................................................................... 22

**Page(s)**

**CASES**

*Aaron v. Mahl*, 550 F.3d 659 (7th Cir. 2008) ........................................... 5, 6, 21

*Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) ............................................... 13

*Douglas-Guardian Warehouse Corp. v. Ramy Seed Co.*, 271 F.2d 24 (8th Cir. 1959) ........................................................................................... 5

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ......................................................... 6

*Heckman v. Williamson County*, 369 S.W.3d 137 (Tex. 2012) ......................... 20

*Illinois Employers Insurance of Wausau v. Mihalcik*, 801 F.2d 949 (7th Cir. 1986) .......................................................................................... 17

*Indianapolis Colts v. Mayor & City Council of Baltimore*, 733 F.2d 484 (7th Cir. 1984) .......................................................................................... 10

*Mutual Life Insurance Co. of New York v. Bohart (In re Bohart)*, 743 F.2d 313 (5th Cir. 1984) ............................................................................... 5

*New York Life Insurance Co. v. Dunlevy*, 241 U.S. 518 (1916) .......................... 7

*New York Life Insurance Co. v. Welch*, 297 F.2d 787 (D.C. Cir. 1961) ........................................................................................................... 5

*Sotheby's, Inc. v. Garcia*, 802 F. Supp. 1058 (S.D.N.Y. 1992) ..................... 5, 11

*State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523 (1967) ...................... 5

*Union Central Life Insurance Co. v. Hamilton Steel Products, Inc.*, 448 F.2d 501 (7th Cir. 1971) ....................................................................... 4, 5

*United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669 (1973) ................................................................................. 20

*Valley Forge Christian College v. Americas United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) ................................................ 20

**STATUTES**

28 U.S.C. § 1335 ................................................................................................. 11

28 U.S.C. § 1397 ........................................................ 11

28 U.S.C. § 1407 ........................................................ 13

28 U.S.C. § 2361 .................................................... 10, 11

Act of Feb. 22, 1917, ch. 113, 39 Stat. 929 ................... 8, 9

Act of Feb. 25, 1925, ch. 317, 43 Stat. 976 ....................... 9

Act of May 8, 1926, ch. 273, 44 Stat. 416......................... 9, 10

Federal Interpleader Act of 1936, ch. 13, 49 Stat. 1096 ............ 9, 10

Tex. Health & Safety Code Ann. § 171.208(a)...................... 20

Tex. Health & Safety Code Ann. § 171.208(b)(2)................... 16

Tex. Health & Safety Code Ann. § 171.208(c)................... 16, 19

Tex. Health & Safety Code Ann. § 171.208(d)...................... 21

Tex. Health & Safety Code Ann. § 171.208(e)(5) .................. 18

Tex. Health & Safety Code Ann. § 171.208(i)...................... 18

Tex. Health & Safety Code Ann. § 171.210(b)...................... 18

LEGISLATIVE MATERIALS

H.R. Rep. No. 64-677 (1916)................................. 7, 8, 11

H.R. Rep. No. 69-719 (1926)...................................... 11

H.R. Rep. No. 74-1437 (1935)......................4, 9, 10, 11

S. Rep. No. 74-558 (1935) ................................. 5, 9, 10

OTHER AUTHORITIES

Andrew D. Bradt, Zachary D. Clopton & D. Theodore Rave, *Dissonance and Distress in Bankruptcy and Mass Torts*, 91 Fordham L. Rev. 309 (2022) ...................................... 1

Andrew D. Bradt & D. Theodore Rave, *Aggregation on Defendants' Terms:* Bristol-Myers Squibb *and the Federalization of Mass Tort Litigation*, 59 B.C. L. Rev. 1251 (2018) ...................... 14

v

Andrew D. Bradt & D. Theodore Rave, *The Information-Forcing Role of the Judge in Multidistrict Litigation*, 105 Calif. L. Rev. 1259 (2017) ................................................................................ 1

Alan Braid, *Why I Violated Texas's Extreme Abortion Ban*, Wash. Post (Sept. 18, 2021), https://www.washingtonpost.com/ opinions/2021/09/18/texas-abortion-provider-alan-braid/ .................... 21

Stephen B. Burbank, *The Class Action Fairness Act of 2005 in Historical Context: A Preliminary View*, 156 U. Pa. L. Rev. 1439 (2008) .............................................................................. 14

Zechariah Chafee, Jr., *Interpleader in the United States Courts*, 41 Yale L.J. 1134 (1932)............................................................ 7, 8

Zechariah Chafee, Jr., *Modernizing Interpleader*, 30 Yale L.J. 814 (1921) ............................................................4, 5, 6, 7, 15, 19

Zachary D. Clopton & Andrew D. Bradt, *Party Preferences in Multidistrict Litigation*, 107 Calif. L. Rev. 171 (2019) ................................... 1

Zachary D. Clopton & D. Theodore Rave, *MDL in the States*, 115 Nw. U. L. Rev. 1649 (2021) ................................................... 1

Geoffrey C. Hazard, Jr. & Myron Moskovitz, *An Historical and Critical Analysis of Interpleader*, 52 Calif. L. Rev. 706 (1964)................................. 6

Samuel Issacharoff, *Class Action Conflicts*, 30 U.C. Davis L. Rev. 805 (1997) .............................................................................. 12

Eleanor Klibanoff, *Texas State Court Throws Out Lawsuit Against Doctor Who Violated Abortion Law*, Tex. Trib. (Dec. 8, 2022), https://www.texastribune.org/2022/12/08/texas-abortion-pro vider-lawsuit/ ......................................................................... 20

Troy A. McKenzie, *Toward A Bankruptcy Model for Nonclass Aggregate Litigation*, 87 N.Y.U. L. Rev. 960 (2012).................................... 13

5 *Moore's Federal Practice* (2022) ................................................. 13

Order Declaring Certain Civil Procedures Unconstitutional and Issuing Declaratory Judgment, *Van Stean v. Tex. Right to Life*, No. D-1-GN-21-004179 (Tex. Dist. Ct. Dec. 9, 2021), *appeal docketed*, No. 03-21-00650-CV (Tex. Ct. App. Dec. 9, 2021)..................... 20

1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* (6th ed. 2022)......................................................................... 12

vi

2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* (6th ed. 2022) ................................................................. 13

Judith Resnik, *From "Cases" to "Litigation,"* 54 L. & Contemp. Probs. 5 (1991) ............................................................................. 15

Judith Resnik, *Lessons in Federalism from the 1960s Class Action Rule and the 2005 Class Action Fairness Act: "The Political Safeguards" of Aggregate Translocal Actions*, 156 U. Pa. L. Rev. 1929 (2008) ............................................................................. 14

Judith Resnik, *The Domain of Courts*, 137 U. Pa. L. Rev. 2219 (1989) .................................................................................... 15

7 Charles Alan Wright et al., *Federal Practice & Procedure* (2d ed. 1986) .......................................................................................... 5

7 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* (3d ed. 2022) .............................................. 4, 5, 6, 7, 14, 19

**IDENTITY AND INTEREST OF *AMICI CURIAE***

*Amici curiae* are Professors Andrew D. Bradt, Zachary D. Clopton, and D. Theodore Rave. *Amici* are law professors with expertise in civil procedure, complex litigation, and civil remedies.[1] Professor Bradt is a Professor of Law at the University of California, Berkeley, School of Law. Professor Clopton is a Professor of Law at Northwestern Pritzker School of Law. Professor Rave is a Professor of Law at the University of Texas School of Law. *Amici* have published extensively about techniques of aggregate litigation. *See, e.g.*, Andrew D. Bradt, Zachary D. Clopton & D. Theodore Rave, *Dissonance and Distress in Bankruptcy and Mass Torts*, 91 Fordham L. Rev. 309 (2022); Zachary D. Clopton & D. Theodore Rave, *MDL in the States*, 115 Nw. U. L. Rev. 1649 (2021); Zachary D. Clopton & Andrew D. Bradt, *Party Preferences in Multidistrict Litigation*, 107 Calif. L. Rev. 1713 (2019); Andrew D. Bradt & D. Theodore Rave, *The Information-Forcing Role of the Judge in Multidistrict Litigation*, 105 Calif. L. Rev. 1259 (2017).

*Amici* have studied the history and meaning of the federal interpleader statute and have an interest in its proper application and use in civil adjudication. *Amici* believe that well-established principles confirm federal interpleader is appropriate in this case.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* certify that this brief was authored entirely by counsel for *amici curiae* and not by counsel for any party, in whole or in part; no party or counsel for any party contributed money to fund preparing or submitting this brief; and apart from *amici curiae* and their counsel, no other person contributed money to fund preparing or submitting this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici curiae* have sought leave of Court to file this brief.

**SUMMARY OF ARGUMENT**

The architects of S.B. 8 designed a private enforcement regime that forces individuals to defend against costly and duplicative litigation. Under S.B. 8, any person who performs or aids in the performance of an abortion in violation of the statute is subject to suit by *any* person in Texas state court, regardless of whether they have a personal stake in the abortion performed. The minimum reward for a successful suit is $10,000.

Indeed, the whole point of S.B. 8's design is to impose overwhelming litigation costs on defendants. Even when they prevail, defendants are barred from raising issue or claim preclusion to defend against subsequent suits over the same conduct. Defendants are also barred from recovering attorneys' fees, even when suits are brought in bad faith. Plaintiffs, on the other hand, are granted a blank check to sue in the venue of their choice, without the possibility of transfer. And there is no limit on the number of plaintiffs who may sue a particular defendant under S.B. 8: Until one plaintiff has successfully collected damages, defendants can be sued by an unlimited number of claimants. Put these provisions together and S.B. 8 defendants like Dr. Braid may be forced to defend themselves in suit after suit across the State of Texas, each brought by plaintiffs who have no personal stake in the litigation.

Congress has devised a tool for federal courts to resolve these sorts of disputes: interpleader. By design, interpleader allows courts to aggregate conflicting claims among adverse parties and avoid multiple litigation run amok. The basic features of interpleader are straightforward. When one party (the

stakeholder) holds money or property (the "*res*") subject to conflicting claims by multiple pursuers (the claimants), interpleader offers an elegant solution. The stakeholder deposits the *res* with the court, and all claimants are required to appear in that court in a single proceeding to determine the rightful owner. Notably, in addition to the joined claimants, stakeholders themselves can lay claim to the *res* as interested parties in the suit.

Congress enacted the first iteration of the Federal Interpleader Act in the early twentieth century, establishing federal interpleader actions to resolve disputes among diverse claimants and reduce duplicative litigation. Since then, Congress has repeatedly amended the statute to liberalize access to federal interpleader. The federal interpleader statute in operation today is especially powerful. It establishes federal subject matter jurisdiction based on minimal diversity and an amount in controversy of only $500. The statute also provides for nationwide service of process and grants federal district courts the power to stay any proceeding—state or federal—that interferes with the interpleader. Congress created this liberal aggregation device to ensure that stakeholders can easily bring *all* claimants to a *res* into a single proceeding in federal court and avoid the vexation of multiple litigation.

The turmoil unleashed by S.B. 8's private enforcement scheme demands a uniform method of dispute resolution. Federal interpleader meets that demand. When multiple plaintiffs sue the same defendant for the same action under S.B. 8, those plaintiffs (and the defendant) are adverse parties with conflicting claims to a *res*—the $10,000 reward. By S.B. 8's terms, only one plaintiff can

ultimately collect the $10,000. But until that *res* is claimed, the S.B. 8 defendant faces the threat of costly multiple litigation. Federal interpleader actions nip these duplicative proceedings in the bud, protecting stakeholders from the unjust expense of defending multiple lawsuits and preserving judicial resources through the efficient resolution of conflicting claims.

**ARGUMENT**

**I. Congress Established Federal Interpleader to Resolve Disputes Among Diverse Claimants and Reduce Duplicative Litigation.**

**A. Interpleader is a flexible, long-standing aggregation device in American law.**

For over 600 years, interpleader has shielded parties from protracted litigation and ensured efficient use of judicial resources in disputes involving competing claims to a single fund. 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1701 (3d ed. 2022). Its "fundamental purpose" is "simple and just": "to protect the stakeholder." Zechariah Chafee, Jr.,[2] *Modernizing Interpleader*, 30 Yale L.J. 814, 818 (1921) (first two quotations); *Union Cent. Life Ins. Co. v. Hamilton Steel Prods., Inc.*, 448 F.2d 501, 504 (7th Cir. 1971) (third quotation). Interpleader affords protection not only from "the risk of double liability," but also against "the expense of double litigation, however groundless." *Union Cent. Life Ins. Co.*, 448 F.2d at 504 (citation omitted). Indeed, the primary test for determining the propriety of interpleader is whether

---

[2] Professor Zechariah Chafee, Jr. is regarded as the father of modern interpleader due to his lead role in drafting the Federal Interpleader Act of 1936 as well as his numerous writings on the subject. *See* H.R. Rep. No. 74-1437, at 2 (1935); 7 Wright & Miller, *Federal Practice and Procedure* § 1701 n.1.

the stakeholder reasonably fears multiple vexation. *Aaron v. Mahl*, 550 F.3d 659, 663 (7th Cir. 2008); 7 Wright & Miller, *Federal Practice & Procedure* § 1704 (describing how most courts stress that the vexation and expense of defending multiple lawsuits warrants the use of interpleader "even absent a substantial danger of multiple liability").

But stakeholders are not the only beneficiaries. By condensing numerous individual actions into a single comprehensive proceeding, interpleader enables the early and effective resolution of conflicting claims with a consequent saving of trouble and expense for "all parties concerned"—stakeholders, claimants, and courts alike. S. Rep. No. 74-558, at 3 (1935); *accord Sotheby's, Inc. v. Garcia*, 802 F. Supp. 1058, 1065 (S.D.N.Y. 1992) (citing 7 Charles Alan Wright et al., *Federal Practice & Procedure* § 1702 (2d ed. 1986)). The "simple, speedy, efficient and economical remedy" of interpleader thus benefits the judicial system as a whole. *Union Cent. Life Ins. Co.*, 448 F.2d at 503–04 (citation omitted).

To effectuate interpleader's fair-minded and pragmatic aims, courts routinely hold that the federal interpleader statute should be construed "liberally." *See, e.g.*, *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 532–33 (1967); *Mut. Life Ins. Co. of N.Y. v. Bohart* (*In re Bohart*), 743 F.2d 313, 325 (5th Cir. 1984); *N.Y. Life Ins. Co. v. Welch*, 297 F.2d 787, 790 (D.C. Cir. 1961); *Douglas-Guardian Warehouse Corp. v. Ramy Seed Co.*, 271 F.2d 24, 28 (8th Cir. 1959) (collecting cases). This approach comports with interpleader's evolution from "a rigid mediaeval remedy" into "a flexible instrument of justice." Chafee, *Modernizing Interpleader*, 30 Yale L.J. at 844; *accord* 7 Wright & Miller, *Federal*

*Practice & Procedure* § 1704 ("[T]he trend, both with regard to statutory revision and judicial interpretation, has been directed toward increasing the availability of interpleader and eliminating those technical restraints on the device that are not founded on adequate policy considerations."). It also reflects interpleader's "equitable" nature. *Aaron*, 550 F.3d at 663. As the Supreme Court has long recognized, the "essence of equity jurisdiction" is the power to "mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). "Flexibility rather than rigidity has distinguished it." *Id.*

Accordingly, when "rigid rules" preclude relief, interpleader "provide[s] the cure"—even in situations "wholly uncontemplated" by existing law. Chafee, *Modernizing Interpleader*, 30 Yale L.J. at 818, 844; *see also* Geoffrey C. Hazard, Jr. & Myron Moskovitz, *An Historical and Critical Analysis of Interpleader*, 52 Calif. L. Rev. 706, 707 (1964) ("If a procedural rule such as the one of interpleader had to answer only for a typical case, most discussions of the rule, and certainly this one, would be exercises. Yet life heaves up atypical situations, and from them stem atypical cases about which something has to be done.").

### B. Congress specifically granted jurisdiction over interpleader actions to the federal courts and has consistently expanded the scope of their authority.

> i. *Congress enacted the federal interpleader statute to settle disputes among claimants from different states and protect stakeholders from the vexation of multiple lawsuits.*

In the early twentieth century, Congress confronted a pressing dilemma. Interpleader's evolution had stalled as judges grew reluctant to permit the procedure in atypical situations and imposed major limitations, transforming

interpleader from "a simple and expeditious remedy" into "a difficult and technical problem." Chafee, *Modernizing Interpleader*, 30 Yale L.J. at 821–22.

A 1916 Supreme Court decision threw this issue into stark relief. In *New York Life Insurance Co. v. Dunlevy*, the Court held that jurisdiction over an interpleader action could not be sustained without personal service on the claimants within the territorial limits of the state in which the court was sitting. 241 U.S. 518, 522–23 (1916). The *Dunlevy* decision thereby rendered interpleader unavailable in federal courts in most cases involving claimants of diverse citizenship. 7 Wright & Miller, *Federal Practice & Procedure* § 1701. In the absence of a federal statute extending the jurisdictional reach of district courts in interpleader actions, the then-prevailing territorial limitations on personal jurisdiction effectively barred courts from offering relief when one of the claimants was from a state other than the forum. *Id.* As a result, businesses facing conflicting claims often found themselves defending multiple suits in different states. H.R. Rep. No. 64-677, at 1 (1916).

Congress promptly responded. In 1917, it enacted the first federal interpleader statute, "exhibit[ing] a clear intention to throw a new type of litigation into the federal courts and remedy an evil which was made obvious by the *Dunlevy* case." Zechariah Chafee, Jr., *Interpleader in the United States Courts*, 41 Yale L.J. 1134, 1161, 1167 (1932). Congress left no doubt as to what evil it sought to cure: "The evil is the inability of the holder of the fund which is claimed by divers[e] claimants, who reside in different States, to obtain proper relief in a tribunal having jurisdiction over all such claimants." H.R. Rep. No. 64-

677, at 2. "[T]he present judicial system," stressed the House Judiciary Committee, afforded "no relief to the holder[.]" *Id.* Instead, "[t]he holder of the fund . . . is at its own expense forced to defend the separate actions." *Id.* "The result is expensive and troublesome litigation[.]" *Id.* at 1.

Congress made clear that such an evil would no longer be tolerated. The 1917 federal interpleader act overrode the *Dunlevy* decision by extending federal jurisdiction to interpleader actions brought by insurance companies or fraternal beneficiary societies, providing for nationwide service of process, and authorizing venue in the district where the named beneficiary resides. Act of Feb. 22, 1917, ch. 113, 39 Stat. 929. Federal courts' new role in interpleader proceedings met little resistance, as state courts had been mostly unable to provide relief at all because of their inability to secure personal jurisdiction over out-of-state claimants. Chafee, *Interpleader in the United States Courts*, 41 Yale L.J. at 1167 ("There is little question of taking these cases away from the state courts,—most of them cannot be decided there at all because of the impossibility of service of process on claimants residing in different states."). As Congress soon realized, however, federal interpleader (like its predecessor in equity) required even greater flexibility—and therefore greater reach—to accomplish its objectives.

    ii. *Congress has repeatedly liberalized federal interpleader and expanded federal jurisdiction over such actions.*

Congress did not stop with the 1917 federal interpleader statute. As novel and complex issues emerged, Congress enlarged the power of federal courts over interpleader actions to increase the availability of interpleader relief. Throughout

the twentieth century, Congress augmented federal courts' authority in three key dimensions: (1) the persons and organizations eligible to use interpleader; (2) the type and subject matter of interpleader actions; and (3) the ability to enjoin state-court proceedings involving the same fund.

First, Congress expanded the scope of persons eligible to use interpleader. The first federal interpleader statute applied only to actions brought by insurance companies or fraternal beneficiary societies. 39 Stat. at 929. But in 1925 and 1926, Congress broadened this list to include insurance associations as well as casualty and surety companies. Act of Feb. 25, 1925, ch. 317, § 1, 43 Stat. 976, 976; Act of May 8, 1926, ch. 273, § 1, 44 Stat. 416, 416.

Dissatisfaction with the 1926 statute led to a comprehensive revision of federal interpleader in 1936, much of which still governs today. In its 1935 report recommending the changes, the House Judiciary Committee noted that although the existing interpleader statute had "operated very successfully," "[i]ts scope [wa]s limited[.]" H.R. Rep. No. 74-1437, at 1. This deficiency led the Committee to conclude that "[t]he extension of Federal interpleader jurisdiction" proved "very desirable." *Id.*

Consequently, Congress enacted the Federal Interpleader Act of 1936. Its "main purpose" was to "justly extend[]" the benefits of interpleader to a wider range of stakeholders. *Id.* at 2 (quoting Zechariah Chafee, Jr., the draftsman of the bill); S. Rep. No. 74-558, at 4. To that end, the 1936 Act authorized "any person, firm, corporation, association, or society" to seek interpleader. Federal Interpleader Act of 1936, ch. 13, sec. 1, § (26)(a), 49 Stat. 1096, 1096. By

"remov[ing]" "[t]he existing limits on the kinds of companies which [we]re permitted to file bills of interpleader," this provision ensured that "th[e] remedy w[ould] become available to individuals and corporations generally if they [we]re subjected to claims by residents of two or more States." H.R. Rep. No. 74-1437, at 2 (quoting Chafee); S. Rep. No. 74-558, at 4.

Second, Congress expanded the type and subject matter of interpleader actions. The 1936 Act allowed "bills in the nature of interpleader," which had not been expressly permitted under the earlier statutes. Federal Interpleader Act of 1936, ch. 13, sec. 1, § (26)(a), 49 Stat. at 1096; S. Rep. No. 74-558, at 4–5. Congress thereby "relaxed the requirement[s] that the stakeholder be neutral and that the conflicting claims have the same origin." *Indianapolis Colts v. Mayor & City Council of Baltimore*, 733 F.2d 484, 486 (7th Cir. 1984); *accord* S. Rep. No. 74-558, at 5 ("The practical difference between the two types of bills is that the long-established equitable principles limiting strict bills are considerably relaxed in cases of bills in the nature of interpleader."). The 1936 Act also allowed the *res* to take any form, ch. 13, sec. 1, § (26)(a), 49 Stat. at 1096, thereby encompassing "other subjects than insurance" within the scope of interpleader, S. Rep. No. 74-558, at 1.

Third, Congress expanded the authority of federal courts to use federal interpleader to avoid overlapping lawsuits. The 1926 statute expressly authorized district courts to enjoin any judicial proceeding involving the same fund as the interpleader action—authorization courts continue to invoke today. Act of May 8, 1926, § 2, 44 Stat. at 416-17; 28 U.S.C. § 2361. By granting federal

courts injunctive power, Congress "[e]nsure[d] the effectiveness of the interpleader remedy," for an injunction "prevents the multiplicity of actions and reduces the possibility of inconsistent determinations." *Sotheby's*, 802 F. Supp. at 1066.

In sum, Congress manifested a resolute commitment to expanding both the availability of federal interpleader and the scope of federal courts' authority in every iteration of the federal interpleader statute.[3] The result is a powerful tool of aggregation that Congress intended federal courts to apply in a wide range of matters, whether they originated under state or federal law. Not only does the current statute confer federal subject-matter jurisdiction based on minimal diversity and an amount-in-controversy of only $500, it also provides for nationwide service of process and the power to stay any judicial proceeding— state or federal—that could interfere with the interpleader action. 28 U.S.C. §§ 1335, 2361; *see also* 28 U.S.C. § 1397 (authorizing venue in any judicial district in which a claimant resides). These features have transformed federal interpleader from a narrow and technical remedy limited to insurance companies and fraternal beneficiary societies into a broad and flexible remedy available to

---

[3] *See* H.R. Rep. No. 64-677, at 3 ("Congress having full power under the Constitution, it is reasonable to expect that it will so enlarge the powers of the district courts as to overcome and eliminate the existing evil, and this the bill in question is intended to accomplish."); H.R. Rep. No. 69-719, at 1 (1926) ("The amendment [authorizing district courts to issue injunctions] is necessary in order to make more adequate the power of the court in the handling and disposition of bills of interpleader."); H.R. Rep. No. 74-1437, at 2 ("[I]t seems desirable . . . to remove definitely a few other obstacles which limit the power of the United States courts to handle these conflicting claims satisfactorily, and the proposed bill contains several provisions aimed at such obstacles." (quoting Chafee)).

any person or business facing competing claims—regardless of their interest in the outcome of the litigation. And it is these features that make federal interpleader the appropriate vehicle for resolving the competing claims presented here.

      iii. *Interpleader is one of many procedural devices designed to empower federal courts to resolve multiparty litigation.*

The expansion of federal interpleader throughout the twentieth century was just one facet of Congress's response to the increasing complexity of civil litigation. To address this challenge, Congress created an array of flexible procedural devices to consolidate lawsuits and promote fairness and efficiency. Like interpleader, each of these devices reflects Congress's intent to enlarge the authority of federal courts over multiparty disputes.

Most familiar among these devices is the class-action lawsuit. Congress adopted Federal Rule of Civil Procedure 23 in 1938 to permit representative class actions, then rewrote the rule in 1966 to achieve greater efficiency and uniformity. 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* §§ 1:14, 1:15 (6th ed. 2022). Notable here, class actions brought under Rule 23(b)(1)(B) function as "the plaintiff's interpleader" in limited fund cases, where individual adjudications would exhaust the defendant's assets before all of the affected parties had an opportunity to be heard. Samuel Issacharoff, *Class Action Conflicts*, 30 U.C. Davis L. Rev. 805, 820–21 (1997). Class certification solves this problem by gathering all affected parties in a single proceeding and

distributing the fund based on fairness rather than a race to the courthouse. 5 *Moore's Federal Practice* § 23.42(2)(a) (2022).

Two other mechanisms established by Congress enable federal courts to centralize multiple proceedings in one court. The multidistrict litigation (MDL) statute, enacted in 1968, authorizes the temporary transfer of related cases pending in multiple districts to a single district judge for coordinated pretrial proceedings. 28 U.S.C. § 1407; 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 6:44 (6th ed. 2022). Similarly, the 1978 Bankruptcy Code brings together all claims against a debtor in a single forum for collective resolution. Troy A. McKenzie, *Toward A Bankruptcy Model for Nonclass Aggregate Litigation*, 87 N.Y.U. L. Rev. 960, 999–1005 (2012).

Critically, all three of these procedural devices enhance the power of federal courts to resolve multiparty litigation. Through the Bankruptcy Code, "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate[.]" *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (citation omitted). With the MDL statute, "Congress's goal was to centralize and increase judicial control of pretrial proceedings in complex cases." 2 *Newberg and Rubenstein on Class Actions* § 6:44 (footnote omitted); *see id.* § 6:46 ("[T]o understand the MDL process, it is important to appreciate the near-plenary power that the MDL judge exercises in such a proceeding."). More recently, Congress expanded the scope of federal jurisdiction over putative class actions under the Class Action Fairness Act of 2005 (CAFA), which eased the

removal of such actions from state court to federal court. Stephen B. Burbank, *The Class Action Fairness Act of 2005 in Historical Context: A Preliminary View*, 156 U. Pa. L. Rev. 1439, 1441, 1517 (2008) (concluding that the Act "unquestionably changes the balance of power in forum selection").

Furthermore, in designing these mechanisms, Congress did not shy away from consolidating state-law claims in federal court. *See* Andrew D. Bradt & D. Theodore Rave, *Aggregation on Defendants' Terms:* Bristol-Myers Squibb *and the Federalization of Mass Tort Litigation*, 59 B.C. L. Rev. 1251, 1299 (2018) (asserting that plaintiffs' preference for MDL will lead to "increased federalization of mass-tort litigation," thereby realizing "the MDL statute's architects' vision" that "nationwide disputes—even those involving state-law claims—will be handled together in national courts"); Judith Resnik, *Lessons in Federalism from the 1960s Class Action Rule and the 2005 Class Action Fairness Act: "The Political Safeguards" of Aggregate Translocal Actions*, 156 U. Pa. L. Rev. 1929, 1947 (2008) (explaining that CAFA "enlarg[ed] the set of cases qualifying for diversity jurisdiction" and, "[a]s a result, more cases arising under state law can and must be litigated in federal court"). Since the first federal interpleader statute was enacted in 1917, interpleader has remained available for claims arising under federal or state law. Indeed, interpleader actions routinely involve adjudication of state-law claims. *See* 7 Wright & Miller, *Federal Practice & Procedure* § 1713 (affirming that state law governs in statutory-interpleader cases and collecting cases).

Taken together, Congress has provided federal courts with a menu of aggregation devices. "Increasingly, those cases that remain in the federal system are aggregated—by multi-district litigation, by bankruptcy, by interpleader, by class action, by consolidation, by informal procedures." Judith Resnik, *The Domain of Courts*, 137 U. Pa. L. Rev. 2219, 2220 (1989); *see also* Judith Resnik, *From "Cases" to "Litigation,"* 54 L. & Contemp. Probs. 5, 22–36 (1991) (describing the expansion of formal aggregation techniques like class actions, interpleader and bankruptcy, and multidistrict litigation throughout the twentieth century). Although the advent of additional aggregate-litigation devices may have decreased the prevalence of interpleader actions, interpleader's role remains the same: ensuring an "efficient and fair-minded system of justice." Chafee, *Modernizing Interpleader*, 30 Yale L.J. at 818. Applying interpleader in this case would fulfill that important role.

## II. Federal Interpleader Is Appropriate for Resolving Conflicting Claims and Duplicative Proceedings That Result From S.B. 8-Type Enforcement Regimes.

Federal interpleader is well suited to resolve the conflicting claims that arise from S.B. 8's private enforcement scheme. It is also necessary to avoid the vexation of multiple lawsuits that the statute invites.

S.B. 8 creates an enforcement regime that encourages claimants from anywhere in the country to try to collect statutory damages from defendants like Dr. Braid. While multiple claimants can sue, only one can recover damages. By limiting the collection of damages to a single party, the statute positions

individual plaintiffs as adverse claimants. The result is an enforcement regime that encourages a race to judgment in state courts, generating duplicative litigation. Congress proffered a solution to these exact problems in the federal interpleader statute.

### A. S.B. 8 creates conflicting claims among adverse parties.

Plaintiffs who sue under S.B. 8 are adverse claimants with conflicting claims to a single fund. The Texas statute grants plaintiffs "statutory damages in an amount of not less than $10,000 for each abortion." Tex. Health & Safety Code Ann. § 171.208(b)(2). However, for each abortion performed, damages are limited to a single successful plaintiff. The law specifies that "a court may not award relief . . . if the defendant demonstrates that the defendant previously paid the full amount of statutory damages . . . in a previous action for that particular abortion performed[.]" *Id.* § 171.208(c).

In this case, three strangers from three different states sued Dr. Braid in state court under S.B. 8 to collect statutory damages for an abortion he disclosed performing on September 6, 2021. Dist. Ct. Dkt. 174, Memorandum Opinion and Order ("Op.") at 2. However, the statute provides that as soon as one plaintiff has successfully collected damages, all other claims are barred. By authorizing an unlimited number of claimants to sue, but only one to recover, the Texas statute has made every individual plaintiff adverse to every other plaintiff. *See* Tex. Health & Safety Code Ann. § 171.208(c). Moreover, each plaintiff is adverse not only to each other but also to the stakeholder; in this case, for example, Dr. Braid seeks judgment that he is entitled to retain the money deposited in the fund

because S.B. 8 violates the United States Constitution. Absent consolidation of these claims into a single interpleader proceeding, S.B. 8 defendants like Dr. Braid are left at the mercy of a race to judgment—one that will be fought in different courts across the State of Texas. Below, the District Court acknowledged that "the Texas statute does not provide a basis to choose one among the three claimants." Op. at 10. But that's not a reason to let repetitive, costly, and potentially inconsistent S.B. 8 litigation play out in multiple Texas state courts. To the contrary, it cuts strongly in favor of aggregating all of the cases in a federal interpleader action where one judge can equitably, efficiently, and consistently sort out the conflicting claims. *See Ill. Emps. Ins. of Wausau v. Mihalcik*, 801 F.2d 949, 951 (7th Cir. 1986) (noting that avoiding a "race to judgment" is one of the purposes of federal interpleader) (citation omitted)).[4]

### B. S.B. 8 is designed to encourage burdensome duplicative litigation.

The threat of duplicative litigation lies at the heart of S.B. 8's enforcement scheme. S.B. 8 is designed to invite duplicative litigation to deter physicians like Dr. Braid from providing abortion care and patients from obtaining it. The law promotes burdensome and duplicative litigation by: (1) barring defendants from asserting issue or claim preclusion, (2) granting plaintiffs choice of venue and

---

[4] It is true that the amount of S.B. 8 damages is not capped—but it is also not unlimited. Ten thousand dollars is the statutory minimum, not the maximum, and a successful S.B. 8 plaintiff may be entitled to attorneys' fees on top of that. But the inability to define the exact scope of a limited fund does not make the fund unlimited—or prohibit the use of equitable procedures to manage competing claims. Whatever damages amount is ultimately set, so long as it exceeds $10,000, only one claimant is entitled to recover, to the exclusion of every other potential claimant.

denying defendants attorneys' fees, (3) creating the risk of multiple liability, and (4) providing plaintiffs with unrestrained authorization to sue.

1. *Claim and issue preclusion:* S.B. 8 bars defendants from raising "non-mutual issue preclusion or non-mutual claim preclusion" as defenses to suit. Tex. Health & Safety Code Ann. § 171.208(e)(5). Thus, even if defendants prevail, they are denied the usual benefits of finality and barred from asserting claim or issue preclusion to prevent others from bringing the exact same suit arising from the exact same conduct. Instead, S.B. 8 defendants like Dr. Braid will be forced to defend and relitigate these cases again and again in Texas state courts until one of the lawsuits comes to judgment against him and he has paid the full amount of statutory damages. It does not matter how many times an abortion provider like Dr. Braid wins; under S.B. 8, he cannot even hope for finality until he loses—and pays.

2. *Costs of litigation:* S.B. 8 ensures that the costs of duplicative litigation are especially burdensome for defendants, but not for plaintiffs. S.B. 8 grants plaintiffs their choice of venue without the possibility of transfer, regardless of how onerous that choice is to the defendant. *Id.* § 171.210(b) ("[T]he action may not be transferred to a different venue without the written consent of all parties."). And regardless of whether these suits are frivolous, S.B. 8 prevents defendants from obtaining attorneys' fees to cover the potentially overwhelming costs of such duplicative litigation. *Id.* § 171.208(i). Coupled with the lack of issue and claim preclusion, these provisions heighten the risks and costs a

defendant must bear in litigating suits brought under S.B. 8, regardless of the suit's merits.

3. *Multiple liability:* Defendants can also face multiple liability under S.B. 8. The law bars collection of statutory damages once a "defendant demonstrates that the defendant previously paid the full amount of statutory damages . . . in a previous action for that particular abortion performed[.]" *Id.* § 171.208(c). But as the District Court observed, "if one claimant obtains a judgment against Dr. Braid but Dr. Braid does not pay the judgment, then another (and another) claimant could obtain a judgment." Op. at 5–6. After all, subsequent state courts are barred from imposing multiple liability only once payment of statutory damages is complete. *See id.*

As explained above, Congress created federal interpleader to avoid the kinds of duplicative litigation and multiple liability that S.B. 8 invites. *See* 7 Wright & Miller, *Federal Practice & Procedure* § 1704 & n.8 (collecting cases). And while the risk of duplicative litigation alone is sufficient to invoke interpleader jurisdiction, the danger of multiple liability makes it essential. As Chafee explained: "The case [for interpleader] is all the stronger where there is a risk of double liability. And if the rigid rules of the law courts make it impossible for [the stakeholder] to get relief there, the more reason why he should get it in equity, which is used to three-cornered litigation and abhors multiplicity." Chafee, *Modernizing Interpleader*, 30 Yale L.J. at 818.

4. *No standing requirement:* Finally, S.B. 8 provides unrestrained authorization to sue. It permits *any* person, other than a Texas official, to bring

19

suit against defendants in any judicial district in Texas. Tex. Health & Safety Code Ann. § 171.208(a). In that way, the law dispenses with any conventional injury-in-fact standing requirement, allowing any person to sue no matter that person's connection to the underlying conduct or the State of Texas. Such requirements typically avoid duplicative and abusive litigation by limiting enforcement authority to those who have a personal stake in the litigation. *See, e.g.*, *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 687 (1973) (reasoning that the injury-in-fact requirement "gives a litigant a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders"); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (noting that standing requirements "foreclose[] the conversion of courts of the United States into judicial versions of college debating forums"); *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) ("In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court. This parallels the federal test for Article III standing."). But here we cannot count on standing requirements to limit duplicative litigation. Under S.B. 8, all private persons become potential plaintiffs.[5]

---

[5] At the time of this filing, a Texas state district court had dismissed Mr. Gomez's S.B. 8 suit against Dr. Braid on standing grounds. *See* Eleanor Klibanoff, *Texas State Court Throws Out Lawsuit Against Doctor Who Violated Abortion Law*, Tex. Trib. (Dec. 8, 2022), https://www.texastribune.org/2022/12/08/texas-abortion-provider-lawsuit/. The case is currently on appeal. *See Gomez v. Braid*, No. 4-22-00829-CV (Tex. Ct. App. Dec. 9, 2022). At least one other Texas state court has held that S.B. 8 is

Here, three private individuals from three different states sued in Texas courts. These individuals have no relation to Dr. Braid's conduct and have suffered no injury. In short, they have no personal stake in the dispute. And still, under the terms of the statute, they are free to bring suit—and they may not be the last to do so. S.B. 8 has a four-year statute of limitations, creating the potential for additional suits over this single abortion well into the future from parties entirely unrelated to the underlying conduct. Tex. Health & Safety Code Ann. § 171.208(d). Indeed, given the highly publicized nature of Dr. Braid's actions,[6] the danger of duplicative future litigation is all but assured.

In combination, these provisions impose the "vexation" of duplicative litigation on S.B. 8 defendants. *Aaron*, 550 F.3d at 663. And that is the point. This private-enforcement mechanism is intended to raise the costs of litigating these suits for potential defendants. Federal interpleader addresses these problems head on. By consolidating suits brought by adverse parties into a single proceeding, the interpleader device eliminates the danger of repetitive S.B. 8 lawsuits that persist indefinitely.

\* \* \*

---

unconstitutional on standing grounds. *See* Order Declaring Certain Civil Procedures Unconstitutional and Issuing Declaratory Judgment at 29–36, *Van Stean v. Tex. Right to Life*, No. D-1-GN-21-004179 (Tex. Dist. Ct. Dec. 9, 2021), *appeal docketed*, No. 03-21-00650-CV (Tex. Ct. App. Dec. 9, 2021).

[6] *See* Alan Braid, *Why I Violated Texas's Extreme Abortion Ban*, Wash. Post (Sept. 18, 2021), https://www.washingtonpost.com/opinions/2021/09/18/texas-abortion-provider-alan-braid/.

Congress established federal interpleader as a flexible tool to be applied liberally by courts to resolve aggregate litigation. If states grant private individuals, like S.B. 8 plaintiffs, unrestrained authorization to sue to enforce a right that is not personal, but rather public in nature, then some equitable procedure that can handle the essentially aggregate nature of the dispute is necessary. Like a class action, MDL, or bankruptcy, interpleader is a tool of aggregation. In this context, it can help tame multiple claimants competing to enforce public rights for profit and curb the threat of onerous duplicative litigation.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this Court to reverse the District Court's order granting the motion to abstain and declining to exercise jurisdiction.

Dated: February 16, 2023

Respectfully submitted,

/s/ Lindsay C. Harrison

Lindsay C. Harrison
  *Counsel of Record*
Leslie K. Bruce
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6865
lharrison@jenner.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 29 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,843 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 12-point Bookman Old Style font for the main text and 11-point Bookman Old Style font for the footnotes.

Dated: February 16, 2023

/s/ Lindsay C. Harrison
Lindsay C. Harrison
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I, Lindsay C. Harrison, an attorney, hereby certify that on February 16, 2023, I caused the foregoing **Brief of *Amici Curiae* Civil Procedure Professors in Support of Plaintiff-Appellant and Reversal** to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (i)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause fifteen copies of the above cited brief to be transmitted to the Court via UPS overnight delivery, delivery fee prepaid within five days of that date.

Dated: February 16, 2023

/s/ Lindsay C. Harrison
Lindsay C. Harrison
*Counsel for Amici Curiae*